2025 IL App (4th) 240929

NO. 4-24-0929

FILED
August 19, 2025
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| CLAYTON T. BELL, | ) | No. 22CF331 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Doherty and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Clayton T. Bell, born on April 21, 2005, appeals the 14-year sentence

he received after pleading guilty to aggravated driving under the influence (aggravated DUI) (625

ILCS 5/11-501(d)(1)(F) (West 2022)) and reckless homicide (720 ILCS 5/9-3(a) (West 2022)).

Among the arguments defendant asserts on appeal is the trial court erred in finding he was provided

the effective assistance of counsel at sentencing after counsel failed to produce evidence relevant

to the youth-based factors in mitigation (see 730 ILCS 5/5-4.5-105 (West 2022)) and failed to

object to unauthorized victim impact evidence. We agree with defendant, reverse the imposed

sentence, and remand for resentencing with directions.

¶ 2                                    I. BACKGROUND

¶ 3        On May 11, 2022, defendant was charged with the above offenses following a

motor vehicle accident resulting in the death of 15-year-old Mia Dusek. The sentencing range for

the aggravated DUI charge was 3 to 14 years, with the possibility of probation in "extraordinary circumstances." 625 ILCS 5/11-501(d)(2)(G) (West 2022).

¶ 4                                      A. Plea Hearing

¶ 5             In March 2023, represented by counsel Kevin Sullivan, defendant entered an open guilty plea to both charges. At the plea hearing, the State provided the factual basis. On February 27, 2022, at approximately 12:15 a.m., officers were dispatched to a vehicle crash with a deceased female, Mia. When Eric Strauss, a deputy with the Peoria County Sheriff's Office, arrived, he observed a black 2009 Ford registered to Kristin Bell, defendant's mother, resting on its top. A debris trail showed the Ford exited the roadway at the top of a hill, rolled over multiple times, and struck an embankment. Two males, defendant and Mia's brother, Reece Dusek, sat near the Ford. Mia "had obvious signs of severe head trauma" and appeared to have been ejected from the vehicle. Deputy Strauss assisted defendant to his feet. He smelled alcohol coming from defendant. At one point, defendant attempted to flee. Defendant and Reece were transported to the hospital, where defendant's blood alcohol content tested at 0.141. Deputy Strauss spoke to Alayna Rudebek, who was also in the Ford at the time of the crash. Alayna reported Reece had been recording on his phone when the crash occurred. Alayna further reported, earlier that evening, they had been drinking at a friend's house. Reece reported everyone had been drinking and defendant had "something like similar to six, seven, eight, too much" to drink. Reece further reported defendant "was driving like an idiot and was speeding up the hill." Reece believed they were going approximately 80 miles per hour. The State reported the sentencing range for aggravated DUI was 3 to 14 years, to be served at 85%, and the sentencing range for reckless homicide was 2 to 5 years.

¶ 6                         B. Presentence Investigation Report

¶ 7             Before sentencing, a presentence investigation report was filed. According to the

report, defendant was a recent high-school graduate, who took honors and Advanced Placement classes and graduated *cum laude*. Defendant's record from Limestone Community High School indicates incidents of "IDV ID violations," "class misconduct," "failure to attend," "tardy," and truancy." The "class misconduct" report resulted from defendant's "messing around and fake fighting another student." After being told to stop, defendant did the same with another student. The truancy report was for two missed days in December 2020. Defendant participated in track, cross country, basketball, football, madrigal club, and National Honor Society. He was named an Illinois State Scholar. Defendant worked as a lifeguard in the summers of 2021 and 2022. Defendant had been admitted to Iowa State University of Science and Technology.

¶ 8 Defendant reported having four close friends. In the past, most of his friends drank alcohol and smoked cannabis. Since the offenses occurred, his friends stopped doing so. Regarding "associates," defendant said half are involved in underage drinking and the consumption of cannabis. Defendant reported first consuming alcohol at age 15. He did not drink regularly but only socially with his friends and "once in a blue moon." When he would do so, he would drink three to four drinks. Defendant first smoked cannabis at age 15. Since the present offenses, he admitted smoking cannabis two to three times. On November 28, 2022, defendant tested positive for cannabis. Defendant completed an alcohol and drug evaluation. He was classified as a moderate risk. After the offense, defendant attended counseling sessions for two to three months. Defendant blamed himself for the offense. When asked what a fair sentence would be, defendant responded it would be "probation and loss of [his] license," with a "huge fine, community service, treatment program[,] and some jail time." When asked about Mia, defendant stated he felt terrible and thought "about it every hour of every day, it never leaves." When asked what the victims feel toward him, defendant said, "Hatred, it is deserved," and "Hopefully some forgiveness."

¶ 9        Attached to the presentence investigation report is the Alcohol and Drug Evaluation Uniform Report. See 77 Ill. Adm. Code 2060.120, amended at 46 Ill. Reg. 17,369 (eff. Feb. 4, 2022). Defendant stated, on the night of the crash, he began drinking alcohol around 9 to 10 p.m. and consumed six to seven seltzer drinks. Defendant reported he also smoked marijuana around 11 p.m., taking three to four hits off a pen.

¶ 10       The presentence investigation report includes a questionnaire completed by defendant's mother, Kristin. Defendant resided with his mother and younger brother after his parents divorced when he was seven. Kristin reported defendant's relationship with her was excellent and with his father as "good but infrequent." Kristin reported defendant had "a counselor he talks to regarding the accident and grief." She stated defendant, at the time she completed the questionnaire, was experiencing "[r]emorse, sadness, anxiety about these proceedings."

¶ 11       Twenty-four letters or statements, made on behalf of Mia and her family, were attached to the presentence investigation report. Among those statements was a letter from Jim Manning. Jim called Mia his stepdaughter. He and Mia's mother, Deborah Beaupre (Deb), had been dating six years and had become became engaged just before Mia's death. Jim told of the pain Deb's family experienced daily. He stated the crash was no "accident," as defendant "left a birthday party that night drunk out of his mind with three young teenagers in his vehicle." Jim stated the girls were screaming "I don't want to die" and Reece yelled "value your life" while defendant "never took his foot off the gas." Multiple coworkers of Deb at Studio B Salon expressed how Deb felt "ruined" and reported her business had been affected. MacKinsey Manning, Jim's daughter, wrote in a letter how she had not met defendant but, at a track meet in May 2022, defendant walked past her, Jim, Deb, and the family "with his head held high and a smug look on his face." MacKinsey asked the trial court to take into consideration defendant's "lack of remorse

and callousness towards Mia's family." Chuck E. Tate, the lead pastor at Rock Church, wrote he had not, in his 32-year ministry, seen anyone impacted by a loss the way Deb had been impacted by the loss of Mia. Tate mentioned only her children, fiancé Jim, and immediate family kept her going.

¶ 12    On behalf of defendant, four letters were attached. Darin Driscoll, the dean of students and assistant track coach at Limestone Community High School, wrote he had the pleasure of knowing defendant for over six years. Driscoll wrote he had had conversations with defendant "about the incident, choices made, and the consequences of choices." Driscoll believed the crash was an isolated incident and defendant would not let the same happen again. Brian Glaza, the track coach at Limestone Community High School, wrote he had known defendant for four years. Glaza called defendant "a phenomenal teammate who frequently places the needs of our team above his own, taking younger athletes under his wing." Glaza wrote, "Looking back on the incident at hand, in the immediate aftermath, [defendant] was a shell of himself, and in some ways, he still is." Although defendant did not state as much, his "feeling of guilt over the situation *** was palpable, and it still is." Glaza wrote defendant is not a person who freely commits wrongdoing with no conscience. Glaza reported defendant felt guilt for his actions and continued to feel it. Shane Seals, a teacher who had taught defendant for three years, opined defendant was not a danger and could have a positive influence. Stacey Seals wrote about the interactions she had with defendant in the prior year. Defendant tried out for the unified basketball team, a competitive team where kids with and without disabilities play together.

¶ 13                                  C. Sentencing Hearing

¶ 14    Defendant's sentencing hearing was held on June 20, 2023. The State began by playing a short audio clip of the "moments" preceding the crash. In the clip, which captures

approximately eight seconds before the crash as they are heading up the hill, Reece says to defendant "slow down" and then twice yells "value your life." One can hear, in what sounds like one of the girl's voices "I don't want to die" and screaming.

¶ 15        After the presentation of the video, family and friends of Mia and Deb read victim-impact statements for the trial court. Cody Ryan Meeks read the letter for his wife Becky Meeks, a coworker and friend of Deb. Cody read Mia was a "wonderful young lady who had her entire life ahead of her." Mia was a "bright light." At times, when Becky arrived at work, she would find Deb with tears in her eyes. Deb would say, "I'm ruined, Becky." Kevin Cassidy, the father of one of Mia's longtime friends, read his letter revisiting memories of his daughter and Mia and lamenting the loss of Mia's future. Cassidy wrote, though time has passed, Mia's "absence fails to wain [*sic*] for" Mia's mother, siblings, extended family, and friends. Kyleigh Miller read that Mia was her best friend. Miller stated the passage of time did not ease her pain but worsened it. Miller lost her fellow graduate, her maid of honor, and the godmother to her future children. Kenny Beaupre, Mia's uncle, read that, "[o]ut of all of us, Mia had the biggest joy of life." Kenny reported the family was not doing well, and "a large sadness [hung] over all of us every day." Susan Beaupre, Mia's aunt, shared the effect of the loss on her two 11-year-old granddaughters, who adored Mia, "one of their most favorite people on the planet." Susan urged the court to send a strong message not to drive under the influence of alcohol. Jim described Mia as an incredible athlete and a straight-A student who had a bright future. At Mia's celebration of life, Jim stated, students and teachers spoke of how special Mia was. Mia would lunch with someone sitting alone and smile at or say hello to individuals in the school hallways. Jim reported Deb relived the accident daily, while defendant finished his senior year of high school, ran cross-country and two seasons of track, drove a float in the homecoming parade, and graduated with his class. Jim stated

a 30-year sentence would not be enough.

¶ 16    Deb also read her letter to the trial court. Deb told the court her life was destroyed when Mia died. Deb spends her life seeing counselors; attending grief classes and retreats; suffering from anxiety, panic, and depression; and medicating. Deb lost most of her business at the salon. Deb reported defendant, in the more than 470 days since Mia's death, had not apologized to the family. Since the accident, Deb was invited to speak to students at high schools about the consequences of their decisions. When she spoke at Limestone Community High School, approximately six weeks after the accident, defendant "opted out of attending." Deb stated defendant "walks around the school so cavalier like nothing has ever happened," and "he had the nerve to even drive the float at the school's homecoming parade." While on pretrial services, defendant was "still smoking pot," having a positive drug test for cannabis in November of the previous year.

¶ 17    The prosecutor began her argument by telling the trial court, "[Y]ou know that I have done murder trials and gone through sentencing hearings, and those have never affected me more than this." The prosecutor stated her son had just turned 15 and gotten his driver's license and her biggest fear was experiencing what Mia's family had. The prosecutor emphasized defendant did not show when Deb gave the presentation at the school about the dangers of drunk driving, defendant did not apologize to the family, defendant drove a float in the homecoming parade, and defendant had a positive drug test in November 2022. The prosecutor felt embarrassed that she had not been able to hold it together. The prosecutor asked for the maximum sentence.

¶ 18    After the State's argument, the trial court asked defense counsel, Sullivan, if he had any argument. Sullivan began by telling the trial court, the State, and everyone in the courtroom, "[A]nything I'm going to say to the Court and part of my argument is not in any way intending to

denigrate the memory of Mia." He acknowledged his job was to advocate for his client. Because Sullivan's strategy at sentencing is key to this court's decision, the rest of his argument, including questions by the court, is below:

"There has been a lot of talk that my client has gone through life since this terrible accident carefree, holding his head up, unaffected. And I think that is just not the case. He may not have worn it on his sleeve every moment of every day, but he internalized it, and he never forgot—he never forgot about it. He will never forget about it. He will have a life sentence of what happened on that fateful evening, and he will live with that no matter what this Court does.

My client accepted my advice throughout this process to remain silent. I perfectly understand from—as his attorney why he did not go to that assembly that day at Limestone. I think he would not have certainly—he did not want to be the spectacle himself—and that likely would have happened—and take away anything that [Deb] wanted to impart to all those other kids.

I think everyone in this courtroom, Judge, wishes we were not here at this point in time for the reasons we are. That is especially true of [defendant]. Despite comments and perspectives to the contrary, my client is contrite. My client is exceptionally and forever remorseful. There is no question that Mia did not deserve to have her life taken so prematurely. There is no question her family didn't

deserve this. And I wish there was something I could do or say to either bring her back herself or soften the impact of this tragic accident.

Judge, these cases are difficult, I'm sure, for the Courts. I'm sure they are difficult for prosecutors, and I can tell you as a defense attorney they are difficult because you see and we see a lot of intentional acts that result in great tragedies. We are dealing here, not necessarily with an intentional act, we are dealing with a reckless act, that was speeding. And, unfortunately, the ultimate consequences were paid because, again, it was a reckless act, but in no way was this intended. This was not foreseen by him at that point in time. Nobody thought this would happen because I think kids that are that age are impervious to those sort of dangers and warnings, and I think they think they are untouchable so to speak.

THE COURT: How about when the other people in the car warned him?

MR. SULLIVAN: I understand that occurred, and that occurred shortly before the collision occurred. I could not tell from that video the speed at which that vehicle was traveling. And I don't know what impact that would have had. And I don't know if there was a process underway where he was starting to slow down or not. I couldn't tell that from the video. But I still don't think that at that moment that he, like most people in his situation at age 16, would

anticipate or appreciate the ultimate consequences of an accident that did, in fact, occur.

I think the Court has to take into consideration that he was 16 when this occurred. He was old enough to have a driver's license, not old enough to vote. Not old enough to do a lot of things. This hill out on Pfeiffer Road near Limestone High School, west of the airport is a dangerous road. I don't think that anything that's happened in February of 2022 or even today is going to stop kids from taking advantage of that attractive nuisance so to speak. Obviously, people 16 years of age, 15 years of age, everybody under 21, the law says it's illegal to drink. No question about that. I would submit to [Y]our Honor that after the dust settles from this event today, this sentencing, regardless of what the Court does, as long as there is liquor stores and bars serving people that age, kids are going to continue to go back to those, another attractive nuisance. That just seems to be what kids do.

Perhaps if my client was traveling five miles an hour less, his vehicle wouldn't have moved in a way it did. We would not be here discussing this. My client—and I ask the Court to consider this as a factor in mitigation—pled guilty. He admitted he was wrong, prepared to accept the consequence of his actions. He did not want the family to have to endure a trial where there would have been a lot of graphic evidence presented. And I think that is one of the

considerations he had in entering a plea before the Court.

He will obviously be separated from his family. They don't deserve that unfortunately. They weren't the ones that caused this, but they will suffer the same way any parent would from separating from your now 18-year-old—or 17-year-old, excuse me—no, 18-year-old son who was on the verge on the precipice of moving on with life.

I also ask the Court to consider cost of incarceration this day and age. I think the courts are required to consider that in formulating a sentence and take the—place the appropriate weight on that.

In terms of the formal—or the statutory factors in mitigation, Judge, I think the following apply: [defendant] did not contemplate that his criminal conduct would cause or threaten serious physical harm. Through insurance, he either has or will compensate the family of Mia. There is no history of prior delinquency or criminal activity. Obviously, having led a law-abiding life for a substantial period of time, albeit he was 16 at the time. The impact of this entire case and the real tears you have seen here today suggest that this type of conduct by him was the result of—was unlikely to recur. He is going to address the Court during his—make a statement in allocution. I think the Court will consider that he is very sincere about his feelings. I think that, again, there will be separation from

his family. I think that's a factor to consider.

Your Honor, when we look at the statutory factors in aggravation, the one that applies across the board, and it was in some of the letters as well, was the sentence is necessary to deter others from committing the same crime. I think that is also a factor that's taken into consideration in this particular statute, which has a unique sentencing scheme which says 3 to 14 years is the range; however, probation is possible if the Court finds exceptional circumstances. We don't know what exceptional circumstances are. There is no statutory definition. There is no common law definition. But this Court can think, as many people maybe do think, well, let's lock him up, throw away the key for 14 years, be done with this. [Defendant] goes off to the Department of Corrections and has to serve 85 percent of that. Is that a deterrence? Again, I submit when the dust settles, he will be forgotten. Kids will forget about the situation. That's not going to result in real deterrence in a situation like this.

THE COURT: How about if it's only a deterrent for a year? I agree people will forget about [defendant] eventually.

MR. SULLIVAN: Well, you know, as Mr. Manning said, the kids at Limestone haven't changed their attitude. The kids are still getting alcohol from some liquor store on the south side.

THE COURT: Maybe I will change it real soon.

MR. SULLIVAN: Well, what I'm proposing, Judge, is one

option the Court could consider is finding because of his youth and inexperience behind the wheel that that could be an exceptional circumstance. You have four years to keep him under your thumb on probation. You can put him on a speaking engagement. He can be affiliated with [Mothers Against Drunk Driving], any sort of driver improvement programs. He could be part of the victim impact panel. He could \*\*\* could make a sandwich board and picket liquor stores and bars that sell to underage kids. That may have an impact.

THE COURT: By the way, has he done any of those yet?

MR. SULLIVAN: He has not.

THE COURT: Yet you said he is full of remorse.

MR. SULLIVAN: That's correct.

THE COURT: Would you agree—and I'm not trying to be funny. Would you agree he has kept that remorse very well hidden?

MR. SULLIVAN: No. Maybe in public. He did go on with life, but I can tell you behind the scenes, it's been rough. And it should be. I'm not \*\*\* making light of that. He wanted to complete school. He did. He wanted to pursue track and field which shows discipline. You know, I guess that's the wrong thing to do in the eyes of some people. But \*\*\* I'm trying to spare a second life in this situation. I don't know what he should have done other than perhaps turned himself in, gone into court early. Stayed home. Done absolutely nothing.

THE COURT: Done a handful of things that you said that I could have him do. The things you just listed.

MR. SULLIVAN: Uh-huh.

THE COURT: Saying that should be part of your list right now, too.

MR. SULLIVAN: Okay. Make him the poster child. And I think who better to talk about the feelings, the remorse, the impact of this. I'm hoping some day Mia's family will have it in them to maybe forgive him. Never forget it, but maybe forgive. Maybe not. It would be a tremendous event going forward, which I hope there are many, many years that this could be done, Mia's mother and my client could ever get together and do a presentation together. I was bad. This is the result. I think that would be exceptionally powerful. I think that would get national attention. They may think that's silly.

I'm trying to—we can't change the past. We can't change the consequences of that terrible accident in February of 2022. What I hope we can do is push something forward. We can have some good come out of this. You can warehouse him for 14 years, and that's fine. And maybe that's the message that the family wants *** an eye for an eye. I'm proposing pass it forward to do some good because the good that can be done will never outweigh what happens, but if it spares one person, one family, one community anything, there is something good that comes out of it.

We talked about the two aspects of any punishment, rehabilitation, punishment. Any sentence, I should say, rehabilitation, punishment. I would agree that somebody that has a long list of priors maybe rehabilitation is not in the cards. How better to allow him to rehabilitate than to get out there and try to stop it from happening again. And I think the Court has the authority to do it.

If the Court is not so inclined, I understand. I'm asking the Court for a lesser sentence, perhaps a boot camp sentence. Impact incarceration, that does put him out—and I think this Court could make, as a condition of mandatory supervised release, the things we just talked about, the suggestions, going forward, do this for your community, for other people. Be out there in the public eye telling them what not to do.

Otherwise, Judge, I would ask for your consideration. My client is an otherwise good person. Made a terrible decision that night. I think you could find any number of people that could have happened to, that, *** cause an accident such as this. Certainly could have happened to me when I was his age. I'm not naive enough to say it couldn't have happened to my kids when they were that age. It's a tragedy. It's still an accident. It was reckless. It was not intentional. And I ask the Court for all of its consideration towards [defendant]. Thank you."

¶ 19	The trial court asked the State if there was cannabis use that night. The State reported defendant admitted he "hit the pin [*sic*] a couple of times that night."

¶ 20	Defendant made a statement in allocution. Defendant reported, since waking up in the hospital to the news, the events of that night "never left [his] mind." Defendant stated he had been "plagued by the terrible things that [he] did that night." As defendant continued with his statement, the trial court interrupted and asked, "[W]hen you were driving the float in the homecoming parade you were full of guilt and shame; is that right?" Defendant responded he was. Defendant apologized to Deb, Jim, and his own family.

¶ 21	The trial court ruled as follows:

"I have considered the presentence investigation report, the evidence presented, the arguments, the statement of allocution, the statement from victims, the financial impact of incarceration, the statutory matters in mitigation and aggravation, which I will specify in a minute. The history and character of the defendant. The defendant's education, job history, statements on his behalf, and the defendant's potential for rehabilitation, which I will specify in a minute.

Having due regard for the circumstances and nature of the offense I find as follows: Statutory factors in mitigation are: The defendant has no history of criminal activity. That's it for statutory factors in mitigation. Statutory factors in aggravation are: The sentence is necessary to deter others from committing the same crime. That's it for statutory factors in aggravation.

And I want everybody to know that I don't like how long it took this case to get to a sentencing hearing. Very unhappy about it. Who is the judge, though, it's me. I signed off on every order that continued this. No one ever said, let's let him get through high school. That was never said to me. [Counsel] had reasons. ***

Imprisonment is necessary for the protection of the public. I told you guys a minute ago—or a while ago, seeing that video, I didn't even know it existed prior to today. See that video and hearing that video, the other people in the car screaming and begging for the defendant to slow down. I don't want to die. Value your life, are two of the things that were said. That chills me to the bone. In addition to being a judge, I'm a human being. I have feelings. That bothered the heck out of me that video. You'll see how far it bothered me in a minute.

I don't agree with defendant when he says every minute of every day he has felt remorseful. His actions show the opposite, which will impact what I say about his rehabilitation prospects, which is big for appellate courts.

Now it's not required that the defendant while he awaits sentencing join a monastery, for instance. It's not required that he go to church every day. When people see you, though, driving a float in the homecoming parade, for instance, and there were a handful of things. That's the one that sticks in my mind the most. And then you

come in and say every minute of every day you felt remorse. Well, you must have been a big downer for your friends, which I'm guessing was not the case. Meaning, I don't believe the defendant. I can word this a lot more harshly, but I won't.

I made the point earlier that you can't keep clean while you are awaiting sentencing? Are you kidding me? Is this some kind of joke? Okay. That reflects on your prospects for rehabilitation. I think when you are faced in your life, [defendant], the time period where you had to be the most clean and decent was from the day you killed Mia Dusek to today when you are going to be sentenced. At a minimum in your life, keep clean for that period of time. Which of those do I have to say? Right, Kevin Sullivan? I recognize—I know the answer to that. And you couldn't do it, which scares me regarding your prospects for rehabilitation.

Plus the event occurred because of cannabis and alcohol. If someone wants to say, oh, it was only because of alcohol, I've got no evidence of that. But, anyway, it's definite that cannabis was consumed by the defendant that evening.

I know all about Pfeiffer Road. 85 in a 30 apparently is undisputed. I don't know why when other people in the car are pleading with you to slow down why you don't. I don't believe defendant's claim of remorse. I'm a former criminal defense attorney and Kevin Sullivan has got to believe what he has got to

do. Kevin Sullivan has nothing to do with this. He has got a job to do.

I'm finding that there is not any extraordinary circumstances that would allow for probation. And I'm about to say how many years he is going to get. ***[A]ny outbursts you go to jail. I'm sentencing [defendant] to serve 14 years in the Department of Corrections, which is the most I can give him. That will be served at 85 percent."

¶ 22                    D. Motion to Reconsider Sentence

¶ 23        In August 2023, defendant, represented by counsel Michael Doubet, filed a motion to reconsider his sentence. In the motion to reconsider, defendant argued, in part, the following: (1) the trial court erred by not considering youth-based sentencing factors; (2) the sentence was excessive; (3) unauthorized victim-impact evidence was admitted; (4) the sentence was based, in part, on inaccurate information; and (4) Sullivan provided ineffective assistance, as counsel failed to investigate and present mitigating evidence at sentencing, did not object to the State's presentation of unauthorized victim-impact evidence, and failed to disclose his connection to Jim Manning.

¶ 24        Attached to the motion to reconsider is an affidavit by Alayna, who was seated next to Mia when the crash occurred. Alayna averred she had been friends with defendant, Reece, and Mia "for many years." On February 27, 2022, she attended a party in Rose Estates. Alayna arrived at the party with Mia and Reece. Defendant was already there. All four of them consumed alcoholic beverages at the party. Near the end of the evening, defendant and Reece said they were going to the gas station to get "polarpops." Mia asked Reece if Alayna and she could ride with them. Reece

at first refused. After Mia continued to ask him, Reece agreed to let them go along. Defendant did not volunteer to drive. Alayna wrote, "[W]e asked [defendant] to drive and he finally agreed." When they turned onto Pfeiffer Road, Mia and Alayna were yelling to defendant to "speed up" and "catch air." Reece was laughing in the front seat and pulled out his phone to record them "getting air." Reece and Alayna did not lose consciousness after the accident. Alayna averred the video shown is not a complete video of the incident. Alayna stated, "I am one of a few people who have seen the entire video in which you can hear Mia and I telling [defendant] to go faster and 'get air.' " At the scene of the crash, Alayna told officers who interviewed her that Mia was saying to "get air" before the accident. Alayna further averred, "The phrase in the video of Reece saying, 'value your life,' was taken out of context." Alayna stated Reece said that "in a frequent manner" and said that "sarcastically to push [defendant] to go faster." Alayna continued:

> "The statements said and screams in the car just before the accident were not those of terrified teens begging [defendant] to slow down, it was just the opposite. It was the sound of teens who had been drinking pushing their friend to drive faster so that they could 'catch air' on the hill and get a good video to show later."

Alayna concluded by stating Sullivan had not contacted her.

¶ 25 Also attached were two letters intended to clear up misstatements to the trial court. One is a letter from Glaza to the trial judge, stating: "It has come to my attention that there is belief that [defendant] drove the truck pulling the homecoming float for the cross[-]country team. This is wholly untrue, and I know this because I drove the truck." Glaza attached a photograph as proof. Billy Weaks, defendant's school counselor at Limestone Community High School, stated he worked with defendant over the last four years regarding scheduling and "social/emotional

- 20 -

concerns." Weaks stated defendant did not attend the drunk-driving presentation at which Deb spoke at Weaks's urging. Weaks said, "[O]ut of respect for [Deb], and other students I advised [defendant] not to attend the presentation."

¶ 26                                    E. Hearing on the Motion to Reconsider

¶ 27        The hearing on defendant's motion to reconsider began on December 7, 2023. The trial court started the hearing by stating it would, on that day, hear testimony from Sullivan. The court stated, "There are claims made by defense that I don't know how *** Sullivan is going to answer as I sit here right now, and those answers might zip it up all nice and neat right now." Doubet called Sullivan to testify.

¶ 28        Sullivan testified he had been a practicing attorney in Peoria County for 36 or 37 years. Three of his cases for aggravated DUIs involved juvenile defendants. Sullivan's father was a judge. Jim, Deb's fiancé, was also an attorney, and Jim's father was a judge in Peoria. Sullivan testified he and Jim were not close friends. They did not "pal around or socialize." Sullivan did not give any business to Jim but did to his firm. Sullivan had no financial relationship with either Jim or his firm. Sullivan had a business relationship with Jim's brother, a financial adviser, who oversaw some of Sullivan's accounts. Sullivan believed he disclosed to defendant's parents his relationship to Jim's brother. When Sullivan took the case, he did not know Jim was involved. Sullivan believed he had heard at some point Jim was in a relationship with Mia's mother, but he did not talk to Jim about it. Not until the sentencing hearing was it confirmed to Sullivan that Jim was in a relationship with Mia's mother.

¶ 29        According to Sullivan, when he took the case, he reviewed the discovery, including police reports and the body camera video, with defendant's parents. He did not know if he showed them the video captured by Reece. The parents had indicated at one point they did not want to see

any further photographs, as they were rather gruesome. Because the parents "were pretty sensitive to it," he tried to take that into consideration. Sullivan was certain he reviewed the discovery with defendant in the office. Sullivan talked about "this is what this is going to show, this is what this will show." Sullivan and defendant discussed his trying to leave the scene. As part of the evidence, Sullivan stated he was certain he reviewed the body camera video in which Deputy Matthew Kaufman was taking a statement from Alayna, but Sullivan stated it did not "ring at a bell" at that time. He remembered reading the report where Alayna told Deputy Kaufman Mia had said something like "catch air."

¶ 30       After counsel asked, "Did you believe that that video would be advantageous to [defendant's] case, or would it be hurting his case," Sullivan responded by describing his strategy:

>     "My strategy on that was it was not going to help his situation at this stage of the proceedings to blame the victim because it was going to be viewed as he was the captain of the ship, the driver, and if they told him to do something, he's expected to follow the rules.
>
>     I thought it would aggravate the situation, in all honesty, and I also thought that when the State played the very brief one or two second video *** where there was screaming and indicating slowing down, that it was apparent in the courtroom, without mentioning it publicly, that that video had already been on.
>
>     It wasn't pulled out a split second in the moment of peril, and I was hoping that that would have been taken into consideration that that video was on for another reason other than the peril or the

unfortunate accident that ensured."

¶ 31    Sullivan did not remember talking to Alayna. He testified he "may have earlier on in the case but not in anticipation of sentencing." Sullivan thought "trying to pass the blame here" "may have looked worse to the Court." When counsel asked if Alayna's statement would have given context to the video and helped mitigate the situation, Sullivan reiterated, "I think it was dangerous to do that, and my strategy was not to do that because it could have made it worse." He did not believe "it was a time for recrimination against Mia." Sullivan believed he could get the mitigating evidence of the context in "[b]y implication and argument," even though he could have gotten the testimony from Alayna.

¶ 32    Sullivan testified he was familiar with the juvenile factors in mitigation. After counsel asked why he did not use them at sentencing, Sullivan replied it was because the statute says the court "shall" and, "[w]ith regard to the other statutory factors, those are more discretionary. I thought these were mandatory, and when the Court would pronounce sentence, the Court would consider these." Sullivan agreed he did not argue the juvenile sentencing factors. He talked to defendant's parents "about the other factors in mitigation." When counsel asked about the application of whether the youth "was subjected to outside pressure including peer pressure, familial pressure, and negative influencing," Sullivan agreed he did not raise this for the same reason. He believed it would be considered by the trial court. He believed "[i]t was argued in [his] summation."

¶ 33    Sullivan testified he did not argue "Mia's provocation" because he did not believe it was appropriate to do so. Sullivan stated he believed he "may have said that they encouraged him to do other—to drive in a certain fashion, and that is how the video came into play." Sullivan did not like to put a young person on the stand, even though he was to present evidence in

mitigation. When counsel asked if he presented evidence in mitigation, Sullivan pointed to the letters regarding defendant's character that were attached to the presentence investigation report, which he believed could mitigate the State's evidence without placing blame. Sullivan testified he did not reach out to any of defendant's teachers, his coach, or the school counselor to determine if defendant was remorseful.

¶ 34   Sullivan acknowledged he did not object when individuals testified regarding their victim-impact statements, stating, "It wasn't the time for me to interrupt people that were grieving." He acknowledged he probably had the statements ahead of time. He said Jim "[c]ould have been a household member," but Sullivan did not know. When counsel asked if only one of those who read their victim-impact statements was qualified as a representative under the statute, Sullivan responded the trial court "has the discretion there." Sullivan, pointing to the statute, said, "It says so here." After Doubet showed Sullivan the language stating the trial court had discretion to permit a number of statutorily defined representatives, and not discretion in determining who are representatives, Sullivan responded, "Well, I consciously decided it would have been insensitive and it would have been detrimental to our case if I would have interrupted at that point."

¶ 35   Doubet asked Sullivan if he, at any time, went over and explained to defendant about his statement in allocution. Sullivan stated, "I believe I sent him a guideline as to what I thought he should put in there." Sullivan stated, "We certainly talked about it. I indicated you can't pass blame. You got to own your mistake." Sullivan went through defendant's statement "[j]ust before" sentencing.

¶ 36   On examination by the State, Sullivan testified he and Jim were "cordial" with each other if they saw each other in public. They may see each other at a bar function and shake hands. When asked about his strategy, Sullivan testified, "I didn't want to appear that we were shifting

the blame in any way or not accepting responsibility which I think is an important factor for a court when it comes to sentencing." Sullivan testified it would have looked bad to place blame on Mia's brother: "I think that would have done more damage in that situation, because again, as the driver of that vehicle, whether you're 16 or 61, you're supposed to be the responsible party, and you're held to a higher standard as the driver."

¶ 37 Sullivan stated there were letters on behalf of defendant in the presentence investigation report, and he expected the trial court to review them before sentencing. Sullivan testified, in his draft of the motion to reconsider the sentence, he wrote he did not believe the court touched on the youth factors in mitigation. Sullivan stated, "I probably would have presented more and maybe gone over and above in the situation, but again, that's easy to say now. I believed at this point that brevity was going to be advantageous and would have more than ensured a lesser sentence."

¶ 38 On redirect examination, Sullivan stated he believed there were five people in the car. Doubet asked where Sullivan learned information about the crash; Sullivan responded, "Probably it was Alayna. It was whoever else was in the back seat. I'm trying to think of the girl. There was a third girl back there, I believe. There's five in the car." Sullivan agreed he did not do the "one thing that could mitigate the entire context of that negative video." On recross-examination, the State asked if, in his argument at sentencing, he provided context about what happened before the crash, and Sullivan responded, "Attempted to, yes."

¶ 39 After Sullivan's testimony, the hearing was continued and did not resume until June 2024. Doubet began by stating, when they "last left off," Sullivan testified as the first witness on the motion to reconsider. Doubet wished to call other witnesses, including Alayna, Glaza, Weaks, and defendant's parents. Doubet argued Sullivan made statements that were not accurate and

Doubet wanted witnesses to counter those statements. Doubet argued it was newly discovered Jim was not a representative under the statute and should not have been allowed to make a victim-impact statement. The State countered by arguing "there actually is no new evidence" and maintained no further testimony needed to be introduced.

¶ 40　　　　The trial court agreed and allowed no new evidence on the motion to reconsider the sentence. Doubet asked to be permitted to make an offer of proof, which the court allowed. In his offer of proof, Doubet called Glaza, Weaks, Alayna, and Kristin.

¶ 41　　　　Glaza testified, as the cross-country coach, he was responsible for organizing the float for the 2022 homecoming parade. Glaza secured defendant's grandfather's truck to pull the float. Glaza drove, while defendant rode on the float with the other cross-country athletes. According to Glaza, riding on the float is "seen as kind of an expectation for those involved in those activities or sports to participate." Glaza encouraged defendant's participation.

¶ 42　　　　Weaks testified, as he stated in his letter supporting the motion to reconsider, he told defendant not to attend the drunk-driving presentation at which Deb spoke. Alayna testified. Her testimony reflects the information in her affidavit. She added she was 16 when the crash occurred. Mia was seated in the middle of the back seat. Alayna further testified she told officers at the scene of the crash that Mia had urged defendant to "catch air."

¶ 43　　　　Doubet called Kristin to counter Sullivan's testimony he did not know Jim was involved until sentencing. At the very first meeting after the accident, Kristin stated they told Sullivan that Jim would be involved in the case. Sullivan said he knew Jim's father very well, and "[t]he families would do holidays together." Jim's brother was a stockbroker. Jim's father and Sullivan's father "competed for office together and they were close. They did holidays and things of that nature together." During the second and third meetings with Sullivan, Kristin reported

Sullivan told them "he had intentionally sent real estate business to Jim Manning during this case," alluding to getting "a feel for where Jim's head was at" and "the family's heads were at."

¶ 44 The State called Michael Hrdlicka, a court security supervisor and former deputy correctional superintendent with the Peoria County jail. Hrdlicka testified about an incident where defendant struck a fellow detainee in his face. A person with defendant stated the victim was taunting defendant about the fact defendant had a 14-year sentence.

¶ 45 On June 20, 2024, the trial court entered its order, finding Sullivan provided effective assistance and denying defendant's motion to reconsider:

> "Original attorney Kevin Sullivan was not 'ineffective' per [*Strickland v. Washington*, 466 U.S. 668 (1984)]. His decisions were based on sound trial strategy and were made to avoid an accusation of 'victim blaming,' which would have resulted had he presented evidence now claimed to show that the decedent, Mia Dusek, should share the blame for the actions which caused her death.
>
> Any alleged deficiency of attorney Sullivan were not '… so serious that counsel was not functioning as the 'counsel' guaranteed the Defendant by the Sixth Amendment'.
>
> The second prong of *Strickland*, that Defendant must demonstrate that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different, also fails.
>
> The only claim by defense that is not covered herein is regarding the reason Defendant did not attend a forum at

Defendant's high school wherein the decedent's Mother was a speaker (regarding driving while intoxicated). Any alleged failure by attorney Sullivan on this point falls short of establishing errors so serious that counsel was not functioning as the 'counsel' guaranteed the Defendant by the Sixth Amendment'. This also does not establish a reasonable probability that the result of the proceeding would have been different.

The Court repeated the claim that [defendant] drove the Homecoming float because that was the information the Court was given. It is this Court's opinion that the people in a float who are having the most fun (lacking constant remorse) are those atop the float (where the Defendant was located), not those driving the float. Sullivan's alleged failure here to point out that discrepancy, whether inadvertent or not, worked to the advantage of the Defendant.

The claim that the Defendant had to endure statements accurately describing him (that he killed someone) would not have impacted the Court in a way favoring the Defendant.

This Court saw and heard the Defendant and is in the sole position of observing the Defendant and determining his alleged remorse and found that there was practically none.

[Defendant] was disingenuous and lacking remorse throughout these proceedings. His claim of 'I will ultimately accept any punishment that the Court deems fit and will strive to continue

to improve throughout my punishment', stated while exercising his right of Allocution at his sentencing hearing, was only to gain favor with the Court, with a false, grandiose statement, that he never intended to fulfill. This cunning display suggests poor prospects for rehabilitation.

The Youth-Based Sentencing Factors were sufficiently considered by the Court. The Court was not sufficiently artful or explicit in detailing same."

¶ 46　　　　This appeal followed.

¶ 47　　　　　　　　　　　　　II. ANALYSIS

¶ 48　　　　　　　　A. Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020)

¶ 49　　　　The State begins its appellee's brief by arguing defendant's statement of facts does not comply with Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020). The State maintains defendant's "selective presentation ignores critical State's evidence, including audio recordings of terrified passengers moments before the crash," as well as evidence showing defendant's blood-alcohol content of 0.141 and his speeding at 80 miles per hour in a 30 mile-per-hour zone despite the passengers' pleas. The State further argues defendant's statement of facts improperly contains argument. The State asks this court to disregard such statements.

¶ 50　　　　We agree with the State. Rule 341(h)(6) requires the statement of facts to "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment." *Id.* Defendant's brief forgoes any description of the sentencing hearing, only mentioning the hearing occurred. Defendant also, when summarizing the motion to reconsider his sentence, interjects argument at the end of the summary of each issue. For example, after

describing his first issue, defendant adds, "These unauthorized statements [led] to the Trial Court being biased against [defendant] at his sentencing hearing." As the State requests, we disregard those portions of defendant's statement of facts.

¶ 51                                    B. Effectiveness of Counsel

¶ 52        The right to counsel is guaranteed by the United States and Illinois Constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. This right applies "at all critical stages of a criminal proceeding," including at sentencing. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 40. The right to counsel is denied when counsel makes errors so serious the attorney was not functioning as the counsel guaranteed by our constitutions. *People v. Holman*, 164 Ill. 2d 356, 369 (1995).

¶ 53        To establish the denial of the right to counsel on a claim counsel's assistance was deficient at sentencing, one must prove *both* prongs of the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). When a defendant raises a claim his or her sentencing counsel provided ineffective assistance, the *Strickland* test requires proof " 'counsel's performance fell below minimal professional standards' " and " 'a reasonable probability exists that the defendant's sentence was affected.' " *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88 (quoting *People v. Sharp*, 2015 IL App (1st) 130438, ¶ 122).

¶ 54        Beginning with the first prong of the *Strickland* test, we measure counsel's performance using " 'an objective standard of competence under prevailing professional norms,' " while recognizing the strong presumption counsel provided adequate assistance and made all significant decisions while exercising reasonable professional judgment. *People v. Brown*, 2023 IL 126852, ¶ 26 (quoting *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). Thus, a defendant seeking to prove he was denied the effective assistance of counsel must overcome the strong presumption

counsel's actions were a matter of sound trial strategy. *Merriweather*, 2022 IL App (4th) 210498, ¶ 40. To overcome that presumption requires proof counsel's strategy was so unsound he or she entirely failed to " 'conduct meaningful adversarial testing of the State's case.' " *People v. Peterson*, 2017 IL 120331, ¶ 80 (quoting *People v. Perry*, 224 Ill. 2d 312, 355-56 (2007)). A mistake in trial strategy or an error in judgment by defense counsel does not alone render counsel's representation constitutionally deficient. *Id.*

¶ 55            When the trial court makes a finding on the merits as to the effectiveness of counsel, we will reverse that decision only if we find the court's decision manifestly erroneous. See generally *People v. Jackson*, 2020 IL 124112, ¶ 98. Error is manifest error when it "is clearly evident, plain, and indisputable." *Id.*

¶ 56            On appeal, defendant challenges the trial court's finding of effectiveness, contending the ruling is against the manifest weight of the evidence. Defendant argues Sullivan provided ineffective assistance by failing to (1) argue the youth-based sentencing factors in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2022)), (2) investigate or present any mitigating evidence at the sentencing hearing, (3) object to the unauthorized victim-impact statements, and (4) disclose his prior relationship with Jim Manning.

¶ 57            The State counters by arguing Sullivan's representation was reasonable and his decisions at sentencing were based on sound trial strategy. The State maintains Sullivan engaged in a "comprehensive and deliberate investigation" and concluded, "[r]ather than risk the severe backlash of appearing to shift blame onto a fifteen[-]year[-]old victim," he should focus on well-established mitigating factors such as defendant's youth, his clean record, his acceptance of responsibility through his guilty plea, and his expression of remorse.

¶ 58            When tasked with representing defendant at sentencing, Sullivan faced the

unenviable task of representing a minor who committed aggravated DUI, resulting in the death of another minor. The trial court would soon consider statutory mitigating and aggravating factors (see *id.* §§ 5-5-3.1, 5-5-3.2) in fashioning a sentence " 'according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' " *Merriweather*, 2022 IL App (4th) 210498, ¶ 31 (quoting Ill. Const. 1970, art. 1, § 11). In doing so, the court would consider " 'the particular circumstances of each case, including factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.' " *Id.* ¶ 32 (quoting *People v. Price*, 2011 IL App (4th) 100311, ¶ 36).

¶ 59 Because defendant was a minor when the crash occurred, the additional youth-based sentencing factors of section 5-4.5-105(a) (730 ILCS 5/5-4.5-105(a) (West 2022)), which a sentencing court must apply to all offenders under the age of 18 at the time of the offense, were available to mitigate the potential sentence. See *Merriweather*, 2022 IL App (4th) 210498, ¶ 31. These factors include the following:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
>
> (3) the person's family, home environment, educational and social background, including any history of parental neglect ***;
>
> (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) Any other information the court finds relevant and reliable, including an expression of remorse, if appropriate." 730 ILCS 5/5-4.5-105(a) (West 2022).

¶ 60  Sullivan knew the State would produce the video of the seconds before the crash, a video—when viewed with no context—portraying defendant as one acting in defiance of his riders' pleas. The weight of the eight-second segment of the video is substantial. One can hear a female voice in the backseat saying, "I don't want to die." One can hear a male voice, presumably Reece, say, "slow down," "slow down," and then yell, "value your life." Sullivan also knew, however, the video did not portray the whole story. A passenger in that vehicle, Alayna, told police at the scene of the crash that Mia had been telling defendant to "catch air." Instead of making use of the mandatory sentencing factors a sentencing court must consider in *mitigation* for his youthful client, particularly the factor requiring consideration of "peer pressure," Sullivan decided to leave the video segment unchallenged and allow the trial court to judge defendant's conduct that night based on the State's presentation of those eight seconds. He did not talk to Alayna. Sullivan elected a strategy of accepting responsibility and not shifting blame to Mia, believing casting any blame on the deceased 15-year-old would result in a greater sentence.

¶ 61 Sullivan's own words reveal his sentencing strategy was built on the premise the culpability of an offender under the age of 18 is the same as the culpability of an adult offender: "again, as the driver of that vehicle, whether you're 16 or 61 you're supposed to be the responsible party, and you're held to a higher standard as the driver." This premise is faulty, as Illinois law plainly recognizes "the diminished culpability of youthful offenders." See *id.* § 5-4.5-115(j). To reflect the "diminished culpability of youthful offenders," Illinois requires a sentencing court to consider youth-based factors to mitigate youth sentences: "the court, at the sentencing hearing ***, shall consider the following additional factors *in mitigation* in determining the appropriate sentence." (Emphasis added.) *Id.* § 5-4.5-105(a).

¶ 62 As the law requires consideration of the youth-based sentencing factors, such as the existence of peer pressure, we reject the idea an argument seeking application of those factors in these circumstances could be seen as "shifting blame." The youth-based sentencing factors are relevant to examine a defendant's level of culpability and his or her state of mind in committing the offense. Without explaining the context with evidence available to him, Sullivan failed to use key evidence from a passenger in the car to show defendant acted, not in callous disregard to his passengers, but in a manner consistent with the wishes and encouragement of his peers. One can accept full responsibility while also explaining one's mindset in the commission of an offense.

¶ 63 At no point while employing his sentencing strategy in the hearing did Sullivan mention, much less argue on his client's behalf, the application of the youth-based sentencing factors in mitigation. At best, Sullivan briefly touched on defendant's youth but focused on the statutory factors in mitigation and aggravation that apply to all criminal defendants and argued, without pointing to any evidence, defendant showed remorse. According to his own testimony, Sullivan did not urge the court's consideration of youth-based sentencing factors but instead

- 34 -

employed the tack of believing the trial court would consider them, as they are mandatory factors.

¶ 64    Sullivan's strategy of ignoring relevant youth-based sentencing factors appears to have left him unprepared to respond to issues plainly troubling the trial court. The court directly questioned Sullivan about defendant's lack of remorse. Sullivan could only attest to his own observations of defendant, which the court did not believe. However, the presentence investigation report and supporting materials contained evidence showing defendant's community involvement, Kristin's and Glaza's brief statements defendant showed remorse, and evidence defendant had attended counseling. In addition, when the trial court touched on the importance of deterrence, stating, as to the kids who were still obtaining alcohol, "Maybe I will change it real soon," Sullivan was unable to guide the court to case law showing less weight should be afforded to deterrence in the sentencing of juvenile offenders. According to the United States Supreme Court, deterrence does not work for youth, as their characteristics of impetuosity and immaturity make juvenile offenders less likely to consider potential punishment. See *People v. Smith*, 2022 IL App (4th) 200666, ¶ 25 (citing *Miller v. Alabama*, 567 U.S. 460, 472 (2012)).

¶ 65    Sullivan's strategy also left the other key piece of the State's evidence unchallenged. After the trial court viewed the unchallenged and unmitigated video showing defendant continuing up the hill as the occupants said, "slow down," "value your life," and "I don't want to die," the court heard from seven individuals who described the loss suffered by Mia's friends and family. These individuals also described defendant's conduct in the year after the crash and requested the maximum sentence. Sullivan's strategy prevented him from objecting to these cumulative statements made by individuals not statutorily authorized to provide them. Section 6(a-1) of the Code of Criminal Procedure of 1963 (725 ILCS 120/6(a-1) (West 2022)) expressly limits victim-impact statements "to those made by actual victims or their representatives" (*People v.*

*Larson*, 2022 IL App (3d) 190482, ¶ 39) and defines "representatives" as " 'the spouse, guardian, grandparent, or other immediate family or household member of an injured or deceased person' " (*id.* ¶ 36 (quoting 725 ILCS 120/6(a-1) (West 2018))). Subsection (a-1)'s limitation on victim-impact statements "was, presumably, imposed in recognition of that fact that victim impact evidence may become so excessive as to deprive a defendant of a fair sentencing and thus violate his or her right to due process." *Id.* ¶ 39. According to the evidence and argument, of the seven, only Deb, Mia's mother, is a "representative." Sullivan's strategy thus left these statements, and the content within them, unchallenged and available for the court's consideration at sentencing (see 725 ILCS 120/6(a-1) (West 2022)). Interestingly, we note Sullivan's testimony shows he was not aware of the statutory language limiting the statements to defined representatives. Sullivan believed the trial court had discretion to allow all to testify and consciously decided not to challenge it.

¶ 66        The State, in its brief, contends the language of section 6(a-1) is a floor and the trial court had discretion to allow nonrepresentatives to read victim-impact statements. We are not convinced. The language of section 6(a-1) is direct. The only discretion granted to the trial court by that language is discretion "to permit one or more of the *representatives* to present an oral impact statement" and to consider the permitted statements "along with all other appropriate factors in determining the sentence of the defendant." (Emphasis added.) *Id.* The two cases cited by the State provide no support. One citation by the State is a page that does not exist (page 468) in a case involving sentence credit. See *People v. Robinson*, 172 Ill. 2d 452, 454-63 (1996). The other is *People v. Rose*, 384 Ill. App. 3d 937, 940-41 (2008), which at best shows a trial court has broad discretion to consider reliable and relevant evidence at sentencing but does not show a court may allow evidence expressly limited by statute.

¶ 67          It "is clearly evident, plain, and indisputable" (see *Jackson*, 2020 IL 124112, ¶ 98) the trial court erred in finding Sullivan's representation reasonable. Sullivan did not address the youth-based sentencing factors in mitigation, particularly the factor involving "peer pressure," or present evidence and argument related to those factors. No reasonable attorney in the same circumstances would have ignored the youth-based sentencing factors and left their youthful client to be sentenced based on incomplete information. Sullivan's strategy was so unsound and unreasonable it left the State's case against defendant without a meaningful adversarial challenge.

¶ 68          Turning to the second prong of *Strickland*, we find the trial court erred in finding no reasonable probability exists the length of defendant's sentence was affected by counsel's unsound strategy. See *Hibbler*, 2019 IL App (4th) 160897, ¶ 88. The sentencing range for every adult or juvenile committing aggravated DUI causing the death of one person is 3 to 14 years. 625 ILCS 5/11-501(d)(2)(G) (West 2022). Defendant was sentenced to the maximum. Reece's video was played at the start of the hearing. Without any context or description of the events before the crash, the court viewed and weighed the evidence, including defendant's statement of allocution, with the impression defendant acted contrary to the pleas of his young passengers. The effect on the sentencing court is evident, as the court stated the following regarding the video before imposing the maximum sentence: "That chills me to the bone. In addition to being a judge, I'm a human being. I have feelings. That bothered the heck out of me that video. You'll see how far it bothered me in a minute."

¶ 69          Had the trial court been presented with the youth-based mitigating evidence of peer pressure or influence and "the level of planning by the defendant before the offense" (see 730 ILCS 5/5-4.5-105(a)(6) (West 2022)), including Alayna's testimony all four were drinking, defendant was asked to drive, and defendant was encouraged to "catch air" before he sped up the

hill, it is "clearly evident, plain, and indisputable" (see *Jackson*, 2020 IL 124112, ¶ 98) a reasonable probability exists defendant would not have been sentenced to the maximum authorized by statute. The trial court erred in finding otherwise.

¶ 70    We, therefore, remand for resentencing. On remand, we direct the appointment of a new judge to preside over resentencing. We question whether the original judge would fairly sentence defendant on remand. In the order on defendant's motion to reconsider, the sentencing judge stated he considered the juvenile mitigating factors of section 5-4.5-105. The record contradicts that statement. At the sentencing hearing, neither defense counsel, the State, nor the trial court mentioned the statutory juvenile factors in mitigation. The judge's own pronouncement at sentencing undermines any assertion these factors were considered before he imposed the maximum sentence allowed for even adult offenders: "Statutory factors in mitigation are: The defendant has no history of criminal activity. That's it for statutory factors in mitigation." While defense counsel did not present sufficient evidence on these factors, the court remained obligated to consider and apply them to the evidence before it. See 730 ILCS 5/5-4.5-105 (West 2022). Moreover, the court allowed and viewed excessive and unauthorized victim-impact evidence. In the interests of fairness and the appearance of propriety, defendant's sentence should be imposed by a judge who has not heard the presentation of that evidence.

¶ 71    Having found resentencing necessary, we need not address defendant's remaining claims of sentencing error.

¶ 72                                III. CONCLUSION

¶ 73    We reverse defendant's sentence and remand for resentencing by a new judge.

¶ 74    Reversed and remanded with directions.

## *People v. Bell*, 2025 IL App (4th) 240929

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 22-CF-331; the Hon. John P. Vespa, Judge, presiding. |
| **Attorneys for Appellant:** | Michael Doubet, of Peoria, for appellant. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Edward R. Psenicka, and John G. Barrett, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |